IN THE SUPREME COURT OF TENNESSEE
AT JACKSON

## BETTY BERRYHILL v. CHARLES THOMAS RHODES

**Appeal from the Juvenile Court for Shelby County**
**No. G8355    Kenneth Turner, Judge**

---

**No. W1997-00167-SC-R11-CV - Decided May 30, 2000**

---

We granted this appeal to determine:  (1) whether parties may enter into a private agreement regarding the payment of child support outside the Child Support Guidelines; (2) whether the evidence preponderates against an award of retroactive child support in excess of the amount agreed upon by the parties; and (3) whether the plaintiff rebutted the presumption that a two-year average of income should be used to determine the amount of child support due under the guidelines.  After careful consideration, we hold that a private agreement as to child support payments violates public policy, that the trial court failed to properly apply the Child Support Guidelines to determine the amount of child support, and that the plaintiff successfully rebutted the presumption that a two-year average of income should be used to determine the proper amount of child support.  We remand the case for an application of the Child Support Guidelines to determine the amount of child support that would be owed under the guidelines and, if appropriate, for findings of fact justifying a conclusion that the application of the guidelines would be unjust or inappropriate.

**Rule 11 Appeal by Permission; Judgment of the Court of Appeals Affirmed as Modified.**

HOLDER, J., delivered the opinion of the court, in which ANDERSON, C.J., and DROWOTA, J., joined. BIRCH, J., filed a dissenting and concurring opinion, in which BARKER, J., joined.

Mitchell D. Moskovitz, Memphis, Tennessee for the Appellant, Betty Berryhill.

Robert L. Green, Memphis, Tennessee for the Appellee, Charles Thomas Rhodes.

### OPINION

Betty Berryhill was a patient of Memphis psychiatrist Dr. Charles T. Rhodes in 1975 or 1976.  The parties began a sexual relationship that resulted in the birth of a child, Anika L. Berryhill, on September 5, 1977.  Dr. Rhodes paid the delivery-related charges not covered by insurance.  Dr. Rhodes then began paying Ms. Berryhill $200 per month.  Dr. Rhodes increased the payment to $300 per month when the child was approximately six months of age.  He continued to make monthly payments until Anika's eighteenth birthday in September 1995.  During Anika's minority, Ms. Berryhill requested additional increases in support.  Dr. Rhodes, however, refused these requests.  In October 1995, Ms. Berryhill filed a petition to establish paternity.  In addition, she requested child support from the date of the child's birth through the period of her minority.

At the time of trial, Ms. Berryhill was forty-six years old and had been primarily employed with the State of Tennessee Division of Rehabilitation Services since 1970. From 1985 through the time of trial, she was also employed part-time at Federal Express. Ms. Berryhill testified that she maintained health insurance coverage for Anika through both jobs to ensure that her child had adequate insurance coverage. She also incurred medical and dental expenses not covered by insurance. These amounts were not specified. Dr. Rhodes provided no insurance. He testified that he was never asked to make any contributions to the child's medical care.

Dr. Rhodes did not visit the child. After the child's birth, Ms. Berryhill sent a photograph of the child to Dr. Rhodes and he "became explosive." Dr. Rhodes acknowledged that he asked Ms. Berryhill not to send any more photographs of the child. Dr. Rhodes saw his daughter in person for the first time when blood tests were conducted in December 1995.

Dr. Rhodes graduated from medical school in 1963. The record reflects that Dr. Rhodes' income varied greatly in the years for which financial records were available. In 1988, 1989, and 1990, his income was substantially higher. In those years he reported earning $125,000 annually under a hospital contract in addition to earnings from his private practice. The hospital contract was not renewed. Since 1990, and through the time of trial, Dr. Rhodes maintained a private practice and experienced declining income. In 1990, Dr. Rhodes divorced his wife of twenty-four years. As a result of the divorce, he paid child support for two children during a portion of Anika's minority. At the time of trial, he testified he was working part-time and contemplating retirement.

The juvenile court referee found that Dr. Rhodes was the natural father of Anika L. Berryhill.[1] The referee also found that the parties voluntarily entered into an agreement for Dr. Rhodes to pay the expenses incidental to the child's birth and to pay a monthly amount of $250[2] and then $300. The payments were made until the child's majority. The referee held that the amount of support agreed to by the parties was "just and reasonable" and it would be "unfair and unreasonable to unjustly enrich the petitioner" by ordering additional support after Anika attained majority. Accordingly, the juvenile court held that "the defendant's payment of support as agreed to by the parties has satisfied his obligations under the law." The trial court awarded attorney's fees to Ms. Berryhill in the amount of $500. The juvenile court judge confirmed the referee's findings.

The Court of Appeals held that the juvenile court failed to comply with the Child Support Guidelines and remanded the case to the juvenile court. Upon remand, the trial court was directed to state the amount that would have been required under the guidelines and to include a justification

[1]The blood test determined the probability of Dr. Rhodes' paternity was 99.99%. Dr. Rhodes did not contest paternity at trial.

[2]Although the referee found that Dr. Rhodes initially paid $250, the undisputed testimony indicated the amount was $200.

for deviating from the guidelines.[3] In making that determination, the trial court must specifically state that the application of the guidelines would be "unjust or inappropriate" instead of "unfair and unreasonable." Although stating that the discussion was not necessary for its decision, the Court of Appeals held that the evidence did not preponderate against the trial court's finding that there was an implied agreement between the parties.

## ANALYSIS

Ms. Berryhill contends that the lower courts erred in finding either an express or an implied agreement between her and Dr. Rhodes as to the amount of support to be paid. She argues that it was error for the juvenile court to deviate from the Child Support Guidelines and to refuse to award additional support. She also argues that the additional support should be awarded based upon a ten-year average of Dr. Rhodes' income rather than a presumptive two-year average provided under the guidelines. Dr. Rhodes argues that retroactive awards are discretionary with the juvenile court. He also argues that Ms. Berryhill should be estopped from seeking additional support because she accepted his payments under an express or an implied agreement. We review the record of the trial court de novo with the presumption that the decision of the trial court with respect to the facts is correct unless the evidence preponderates against such factual determinations. Farrar v. Farrar, 553 S.W.2d 741, 743 (Tenn. 1977).

### Private Agreement for Child Support

Ms. Berryhill contends that both the Court of Appeals and the juvenile court erred in finding that the parent of a child to whom child support is owed may enter into a private agreement[4] to accept child support less than that required to be paid under the Child Support Guidelines and Tenn. Code Ann. § 36-5-101 (1995). The Court of Appeals examined the actions of the parties and determined that an "implied agreement" existed between the parties. In part, the court relied upon the language of Tenn. Code Ann. § 36-5-101(h) to hold that informal agreements "between adult parties should be a consideration of the court."

Our paternity and child support statutes and the Child Support Guidelines evince a policy that children should be supported by their fathers. The paternity statutes provide a process by which the putative father can be identified. Once identified, the father is required to furnish support and education for the child.[5] Tenn. Code Ann. § 36-2-102 (repealed in 1997; corresponding section now

---

[3] The Court of Appeals also found that the trial court abused its discretion with respect to the award of attorney's fees. That issue was not appealed to this Court.

[4] A "private agreement" as used in this opinion is an agreement entered into by the parties without court approval.

[5] The statute also requires the father to pay the child's funeral expenses, the expenses of the mother's confinement and recovery, and the mother's attorney's fees. Tenn. Code Ann. § 36-2-102.

found at Tenn. Code Ann. § 36-2-311); Cline v. Drew, 735 S.W.2d 232, 235 (Tenn. Ct. App. 1987); Frazier v. McFerren, 55 Tenn. App. 431, 438, 402 S.W.2d 467, 471 (1964). The paternity statutes incorporate both the child support provisions pertaining to divorce decrees as well as the Child Support Guidelines. See Tenn. Code Ann. § 36-2-108(d) (repealed in 1997; corresponding section now found at Tenn. Code Ann. § 36-2-311), incorporating Tenn. Code Ann. § 36-5-101. The legal duty of support exists in all cases. Smith v. Puett, 506 F.Supp. 134, 142 (M.D. Tenn. 1980).

Tennessee Code Annotated § 36-5-101(h), incorporated in the paternity statute, states that any agreement reached by parents regarding child support may be affirmed, ratified, and incorporated into a divorce decree.[6] This subsection contemplates that the agreement: 1) will be in writing; 2) will be approved by a court; 3) will be incorporated into a court order;[7] and 4) will contain the parties' acknowledgment that they may not alter the agreement without court approval. If the parties meet these requirements, they may enter into a valid agreement to set child support. In this case, the parties met none of the requirements of the statute. We fail to see how the enactment of § 36-5-101(h) evinces a legislative intent to uphold private agreements that fail to comply with the statute in any respect.

Although this Court has not specifically addressed the issue of the validity of a private

---

[6]Tenn. Code Ann. § 36-5-101(h) states:

> Nothing in this section shall be construed to prevent the affirmation, ratification and incorporation in a decree of an agreement between the parties as to support and maintenance of a party or as to child support. In any such agreement, the parties must affirmatively acknowledge that no action by the parties will be effective to reduce child support after the due date of each payment, and that they understand that court approval must be obtained before child support can be reduced, unless such payments are automatically reduced or terminated under the terms of the agreement.

[7]This is consistent with the Child Support Guidelines which state:

> Stipulations presented to the court shall be reviewed by the court before approval. No hearing shall be required. However, the court shall use the guidelines in reviewing the adequacy of child support orders negotiated by the parties. The court shall require that stipulations in which the guidelines are not met must provide a justification for the deviation which takes into consideration the best interest of the child and must state the amount which would have been required under the guidelines.

Tenn. Comp. R. & Regs. Ch. 1240–2–4–.02(4).

agreement for payment of child support, other states that have considered the issue have found such agreements violate public policy. In <u>Paul M. v. Teresa M.</u>, 818 S.W.2d 594 (Ark. Ct. App. 1991), the Arkansas appellate court rejected a father's argument in a paternity action that he was relieved of his support obligation because the child's mother had agreed to take full responsibility for the child. "Insofar as the agreement at issue here represents an attempt to permanently deprive the child of support, it is void as against public policy." <u>Id.</u> at 596. The court stated that a duty of support cannot be bargained away permanently to the detriment of the child. Similarly, the court has held that an agreement not to seek increases in child support is void as against public policy. <u>Id.</u> at 595. "These holdings are based on principles that the interests of minors have always been the subject of jealous and watchful care by the courts . . . ." <u>Id.</u> Likewise, in <u>Worthington v. Worthington</u>, 301 S.E.2d 44 (Ga. 1983), the Georgia Supreme Court held that a lump sum payment of $10,000 to the child's mother did not release the father from his child support obligations. "Children, legitimate or illegitimate, are not property, and absent a clear legislative declaration otherwise their support rights may not be bartered away by their parents." <u>Id.</u> at 46.

Courts in several jurisdictions have found that a child's right to support cannot be bargained away by a parent to the child's detriment. <u>Davis v. Office of Child Support Enforcement</u>, 908 S.W.2d 649, 651 (Ark. 1995); <u>see also</u> <u>Gammon v. Cobb</u>, 335 So. 2d 261, 266-67 (Fla. 1976) (noting that the mother is the trustee who receives funds and simply converts them into relief for the children); <u>Livsey v. Livsey</u>, 191 S.E.2d 859, 860 (Ga. 1972); <u>Tuer v. Niedoliwka</u>, 285 N.W.2d 424, 426 (Mich. Ct. App. 1979) (adopting holding that "an illegitimate child's right to support from a putative father cannot be contracted away by its mother, and that any release or compromise executed by the mother is invalid to the extent that it purports to affect the rights of the child"); <u>State v. Dongher</u>, 50 N.W. 475, 475 (Minn. 1891) (rejecting father's argument that he was released from child support obligations by the payment of $100 to the mother); <u>Fox v. Hohenshelt</u>, 528 P.2d 1376, 1381 (Or. Ct. App. 1974) (holding that two parties should not be able to prejudice the rights of a third and that a contract between mother and putative father of illegitimate child cannot preclude future filiation proceedings for purposes of child support without judicial scrutiny and approval); <u>Diehl v. Mulhern</u>, 594 A.2d 692, 695 (Pa. Super. Ct. 1991); <u>Shelby J.S. v. George L.H.</u>, 381 S.E.2d 269, 271 (W. Va. 1989) (noting court's caution in permitting a mother to settle child support claims with natural father).

We find the holdings and reasoning of these courts to be persuasive. Tennessee's statutory provisions for the establishment of paternity and support and the Child Support Guidelines evince a policy that fathers will support their children. Private agreements used to circumvent the obligations set forth in the statutes and guidelines contravene that policy.

**Additional Amount of Support**

Although we have determined that any private agreement, whether express or implied, would violate public policy, we recognize that Dr. Rhodes made monthly payments of $200 and $300 during Anika's minority. We must, therefore, address whether the evidence preponderates against the trial court's conclusion that the amounts paid were "just and reasonable" and that it would be "unfair and unreasonable to unjustly enrich" Ms. Berryhill by ordering additional amounts of support

subsequent to Anika's majority. For the reasons below, we conclude that a remand to the juvenile court is necessary.

The legislature has provided for retroactive awards by statute and by the incorporation of the Child Support Guidelines promulgated by the Tennessee Department of Human Services, Child Support Services Division. Retroactive child support is available whether the child is a minor or whether the child has reached the age of majority and brings the claim within time permitted by the statute. Tenn. Code Ann. § 36-2-103(b)(1) (repealed in 1997; corresponding section at Tenn. Code Ann. § 36-2-306). Furthermore, courts are required to apply the Child Support Guidelines as a rebuttable presumption in determining support, and the 1994 guidelines explicitly provide "that the rebuttable presumption must be applied to all child support awards *even if the order is being sought for a retroactive period before October 13, 1989.*" Tenn. Comp. R. & Regs. ch. 1240–2–4–.01(2) (emphasis added). This Court has held that the guidelines "carry what amounts to a legislative mandate." Nash v. Mulle, 846 S.W.2d 803, 804 (Tenn. 1993). Accordingly, the mere action of seeking an award of retroactive child support within the time frame permitted by statute cannot render a request for child support either "unjust" or "inappropriate."

The Court of Appeals in this case recognized the guidelines apply as a rebuttable presumption regarding the amount of child support to be paid. The court, however, stated that the presumption is not to be construed as an abrogation of this Court's statement in Coleman v. Clay, 805 S.W.2d 752, 755 (Tenn. 1991), that a court "has broad discretion to determine the amount of such a retroactive award." This Court acknowledged in Coleman that a father is responsible for the support of his child and that this obligation arises at the date of the child's birth. Id. at 754-55. This Court further stated that a juvenile court judge has broad discretion to determine the amount of such a retroactive award. Id. at 755.

The Child Support Guidelines, however, were silent as to retroactive awards when this Court decided Coleman. Subsequent to the decision in Coleman, retroactivity provisions were added to the Child Support Guidelines. The specific inclusion of these provisions in 1994 limited the courts' discretion in setting amounts of child support. While the juvenile court continues to have discretion in making awards of child support, that discretion must be exercised within the strictures of the Child Support Guidelines.

The Court of Appeals remanded the case to the trial court to require the trial court to state the amount of child support that would have been required under the guidelines as well as a justification for deviation from the guidelines. We agree that a remand is required in this case for the trial court to make appropriate findings of fact. The guidelines provide a general formula for calculating the appropriate amount of child support based on an obligor's income and include a procedure which permits limited deviation downward from the general formula. Tenn. Comp. R. & Regs. ch. 1240–2–4–.04 (2)(a) & (b) and (4) (1994). The guidelines also mandate a deviation upward under certain circumstances. Tenn. Comp. R. & Regs. ch. 1240–2–4–.04 (1)(a)-(d) and (f) (1994). The guidelines "are a minimum base for determining child support obligations." Tenn. Comp. R. & Regs. ch. 1240–2–4–.02(5).

"[T]he guidelines expressly provide for downward deviation where the obligee has utterly ceased to care for the child(ren); where the obligee clearly has a lower level of child care expense than that assumed in the guidelines; and where the obligor is saddled with 'extreme economic hardship.'" Jones v. Jones, 930 S.W.2d 541, 545 (Tenn. 1996); Tenn. Comp. R. & Regs. ch. 1240–2–4–.04(2)(a)-(b), –.04(4). "Although the rule does not purport to set forth an exhaustive list of instances in which downward deviation is allowed, these specific instances nevertheless are a powerful indication as to the types of situations in which it is contemplated under the guidelines." Jones, 930 S.W.2d at 545. The guidelines indicate that the court "shall" increase the award if the obligor is not providing health insurance, if the obligor is exercising less than average visitation, if extraordinary medical and educational expenses exist, or if the court finds that equity requires it. Tenn. Comp. R. & Regs. ch. 1240–2–4–.04(1).

After determining the amount of child support under the guidelines, the trial court may then consider whether the evidence is sufficient to rebut the presumption. To deviate from the presumptive amount, a court must enter:

> a written or specific finding on the record that the application of the guidelines would be unjust or inappropriate in a particular case . . . in order to provide for the best interest of the child or the equity between the parties and the court must show what the child support award would have been without the deviation.

Tenn. Comp. R. & Regs. ch. 1240–2–4–.01(2)-(3), ch. 1240–2–4–.02(7)(1994); see also Tenn. Code Ann. § 36-5-101(e)(1).

### Time period for computation of retroactive child support

On remand the trial court will determine the amount of child support that would be due under the guidelines as well as the appropriateness of any deviation. In making the initial determination of child support, the trial court must determine the gross income of Dr. Rhodes during the time periods in question. In setting retroactive awards, the guidelines provide that the obligor's income for the last two years is presumed to be correct unless rebutted by either party. Tenn. Comp. R. & Regs. ch. 1240–2–4–.04(1)(e).[8] We must therefore consider whether Ms. Berryhill has successfully

---

[8] In cases where initial support is being set, a judgment must be entered to include an amount due for monthly support from the date of the child's birth or date of separation or date of abandonment whichever is appropriate, until the current support order is entered. *This amount must be calculated based upon the guidelines using the average income of the obligor over the past two years and is presumed to be correct unless rebutted by either party.* An amount should be included in the order to reduce the arrears judgment on a monthly basis within a reasonable time.

rebutted this presumption. We conclude that on the record before us Ms. Berryhill has done so.

Dr. Rhodes produced tax returns for ten years, 1983 and 1987-1995. Using those returns, an accountant testified that Dr. Rhodes' gross income was as follows:

| | | | |
|------|-----------|------|-----------|
| 1995 | $51,250   | 1990 | $333,856  |
| 1994 | $47,490   | 1989 | $294,067  |
| 1993 | $80,286   | 1988 | $235,553  |
| 1992 | $123,057  | 1987 | $98,248   |
| 1991 | $173,427  | 1983 | $30,388   |

Doctor Rhodes testified that his income reported in 1988, 1989, and 1990 was unusually high because he entered into a contract with a hospital and earned $125,000 per year in addition to his private practice. Dr. Rhodes testified that at the time of trial in 1996 his practice had become close to part-time and that he was contemplating retirement.

Dr. Rhodes graduated from medical school in 1963. Using the last two years of his income would unfairly emphasize a time when it appears Dr. Rhodes was winding down his medical practice. Furthermore, the obligation or duty of support spanned eighteen years – the entire life of the child. We conclude that Ms. Berryhill successfully rebutted the presumption that a two-year average should apply. She demonstrated that a representation of income over a longer period would be more appropriate. Based upon this record, however, it is unclear that the ten-year average proposed by Ms. Berryhill would be appropriate.

Ms. Berryhill presented testimony from an accountant who made certain calculations based upon Dr. Rhodes' income over ten years. The accountant acknowledged that the information he used was not complete and may not have fully taken into account Dr. Rhodes' other child support obligations when determining his average income. Although Dr. Rhodes' counsel had requested additional income tax returns from the Internal Revenue Service, those records were not available at the time of trial. Counsel for Dr. Rhodes elected to go forward with the available records.

### CONCLUSION

We conclude that private agreements for the payment of child support violate public policy. We remand the case for an application of the Child Support Guidelines to determine the amount of child support that would be owed under the guidelines and, if appropriate, for findings of fact justifying a conclusion that the application of the guidelines would be unjust or inappropriate.

Upon remand, Ms. Berryhill should be permitted to offer additional evidence as to her medical and dental expense claims. We hold that Ms. Berryhill successfully rebutted the presumption that a two-year average of Dr. Rhodes' income should be used in determining the

---

Tenn. Comp. R. & Regs. 1240–2–4–.04(1)(e) (emphasis added).

amount of child support due under the guidelines. Dr. Rhodes, however, should be permitted to offer additional evidence regarding his income for the years in question. The juvenile court will then determine the appropriate time period for averaging Dr. Rhodes' income. Dr. Rhodes shall receive credit for the monthly payments he previously made. The case is remanded to the juvenile court for further proceedings consistent with this opinion. Costs of this appeal are to be taxed against Dr. Rhodes.